# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEFFRY LEWIS CORBIN,

Defendant-Appellant.

FOR PUBLICATION
September 22, 2015
9:05 a.m.

No. 319122
Leelanau Trial Court
LC No. 11-001747-FH

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

GLEICHER, J.

The prosecution charged that defendant sexually abused two young brothers. Both victims are now adults; we refer to them pseudonymously as Shane and Austin. Defendant pleaded guilty to the charged conduct involving Shane. The prosecutor dismissed a single count involving Austin. The trial court sentenced defendant to prison and ordered him to pay $276,800 in restitution to Austin, and $276,985 to Shane. Defendant challenges only the restitution order.

We conclude that the restitution awards cannot stand. Because defendant's illegal acts involving Austin did not give rise to defendant's convictions, Austin is not entitled to any restitution. Shane's restitution award, too, must be vacated, as the evidence provided no reasonable factual basis for substantial components of the total. Accordingly, we vacate most of the restitution order and remand for further proceedings.

I.

Austin and Shane were born in 1989 and 1991, respectively. They resided in Kansas City with their mother and father until 1992, when the parents separated. The parents' divorce finalized in 1994, and the brothers moved with their mother to Traverse City. Their father relocated to Belgium a year later and remained overseas until 2000, when he returned to Kansas City.

Defendant and his wife lived in Traverse City and were close friends of the brothers' mother. Shane described defendant as a quasi-father figure. As boys, the brothers frequently visited defendant's home. Defendant repeatedly assaulted them there, and on cross-country skiing trips in Canada, between 1995 and 2005. Shane disclosed the abuse in January 2011. When interviewed by the police, defendant admitted to having engaged in sexual contact with both brothers.

-1-

The felony information set forth three counts of second-degree criminal sexual conduct (CSC) involving Shane, and one count involving Austin. At defendant's guilty plea hearing, the prosecutor conceded that the statute of limitations had run on the allegations concerning Austin and voluntarily dismissed that charge. When tendering his guilty plea, defendant nevertheless admitted to having engaged in criminal sexual conduct with Austin.

The trial court imposed an upward departure sentence of 9 to 15 years' imprisonment and subsequently convened a restitution hearing. At the hearing, the victims' father conceded that he had been physically separated from his sons during an approximately six-year period, but denied that he had been meaningfully absent from their lives. He detailed the expenditures he attributed to their sexual abuse. The father recounted that he incurred "roughly $4000" in therapy charges for both victims, and provided an "estimate" of the costs incurred for their medications as "about a thousand dollars." Shane had failed his first year of college due to the trauma of the abuse, the father asserted, resulting in a separate financial loss of "[a]pproximately $20,000." Both sons lost income, the father claimed, because the pending court proceedings rendered them unable to accept job offers at two affiliated ice cream shops that would have paid each $400 weekly. The father elucidated: "They were really in no condition to take on a role of management in a time consuming process we were going through at the time with this."

The victims described the psychological trauma caused by the assaults and the difficulties they have endured in trying to lead normal lives. Shane explained that he has been diagnosed with post-traumatic stress disorder (PTSD), which causes flashbacks and nightmares. He agreed with the prosecutor that the PTSD "affected" his ability to be successful in college, and "interfered with" his ability to obtain gainful employment. Austin, too, suffers from PTSD. He completed only one year of college before deciding that he was emotionally unable to continue attending classes.

Beginning in 2011, both victims have engaged in psychological counseling with Mark McGonigle, a licensed clinical social worker in Missouri. McGonigle has an undergraduate degree in psychology from the University of Dallas, a master's degree in "social welfare" from the University of Kansas, and a master's degree in "applied spirituality" from the University of San Francisco. Defendant's counsel stipulated to McGonigle's qualifications to testify as an expert witness in "the area of PTSD." McGonigle served as the prosecution's sole witness regarding the victims' need for therapy and the projected costs of their care.

McGonigle characterized PTSD as "an anxiety disorder" that produces "a chronic reaction to traumatic events that kind of creates its own syndrome of emotional, mental and behavioral problems." To qualify for the diagnosis, an individual must "have a significant impairment in functioning both inner [sic] personal, social, occupational or other important areas of functioning." In McGonigle's view, Shane "had both major depression that was recurrent in his life and post-traumatic stress disorder." McGonigle attributed the cause of Shane's PTSD to "the sexual abuse he experienced from [defendant], and that was also a major factor in his depression." Austin shares the PTSD diagnosis and its cause with Shane; McGonigle did not diagnose him as suffering from major depression "because he hasn't shown those symptoms."

McGonigle testified that although his contact with Shane had been "somewhat sporadic," they "developed a treatment plan for treatment of PTSD. . . . I was expecting kind of a long

course of treatment with possible referral to in-patient intensive therapy as needed." In a written report admitted as evidence during the hearing, McGonigle expressed that the brothers "will likely need therapy for a period of many years and likely intermittently over the course of their lives, especially as they mature into men of marital age." The cost of that therapy, he elaborated, would depend "on the individual therapist's fee structure, [and] will likely cost approximately $14,000-18,000 per year." "To be secure," he continued, "and given their young ages, I think they should plan to receive at least 8-10 years of such treatment."

McGonigle explained that the "intensive inpatient treatment" he recommended could occur at a facility such as The Meadows in Arizona, which charges "approximately $42,000" for a stay of four to six weeks. The brothers' projected future "psychiatric care" and medication costs, McGonigle predicted, would range from $3,000 to $5,000 each year. McGonigle's report, admitted as an exhibit by the trial court, indicates that Shane had paid $1,785 "[t]o date" for his therapy.[1]

In a bench opinion, the trial court awarded both victims $15,000 a year in outpatient therapy costs for eight years, totaling $120,000 per person. The trial court found that both victims were also entitled to the costs of inpatient admissions at The Meadows, which the court estimated as $42,000 each. The court adopted McGonigle's cost estimates for medication and psychiatric services of $40,000 for each victim, and further granted each brother $31,200 in "lost wages," yielding a total of $275,200 each. The court then added to that sum the amounts already paid for treatment: $1,600 for Austin, and $1,785 for Shane.

Defendant sought delayed leave to appeal the restitution order. This Court denied the application "for lack of merit in the grounds presented." *People v Corbin*, unpublished order of the Court of Appeals, entered April 25, 2014 (Docket No. 319122). Defendant then sought leave to appeal in the Supreme Court, and moved to add issues for that Court's consideration. The Supreme Court granted the motion to add issues and, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted. *People v Corbin*, 497 Mich 886; 854 NW2d 881 (2014).

II.

The William Van Regenmorter Crime Victim's Rights Act (CVRA), MCL 780.751 *et seq.*, mandates that a sentencing court order convicted defendants to make "full restitution to any victim of defendant's course of conduct that gives rise to the conviction[.]" MCL 780.766(2). A "victim" is "an individual who suffers direct or threatened physical, financial, or emotional harm as a result of the commission of a crime." MCL 780.766(1). Under the CVRA, restitution is

---

[1] McGonigle's treatment records, admitted as an exhibit at the restitution hearing, reflect 12 visits with Shane in 2011, and none in 2012. McGonigle testified that he had approximately four sessions with Shane in 2013 that he had not yet documented. Assuming that he had also not billed for the 2013 sessions, we calculate that McGonigle charged $148.75 for each session. At a similar rate, $15,000 a year would yield approximately 100 therapy visits.

available to compensate victims for losses associated with either physical or psychological injury. An order of restitution may compel a defendant to:

> (a) Pay an amount equal to the reasonably determined cost of medical and related professional services and devices actually incurred and reasonably expected to be incurred relating to physical and psychological care.
>
> * * *
>
> (c) Reimburse the victim or the victim's estate for after-tax income loss suffered by the victim as a result of the crime. [MCL 780.766(4).]

Michigan's general restitution statute, MCL 769.1a, defines "victim" in essentially the same fashion, clarifying that the term reaches individuals harmed "as a result of the commission of a felony, misdemeanor, or ordinance violation." MCL 769.1a(1)(b). Like the CVRA, the general restitution statute demands that a sentencing court order restitution when appropriate. MCL 769.1a(2). The language differs, however, regarding restitution for the costs of medical or psychological care:

> (4) If a felony, misdemeanor, or ordinance violation results in physical or psychological injury to a victim, the order of restitution may require that the defendant do 1 or more of the following, as applicable:
>
> > (a) Pay an amount equal to the cost of actual medical and related professional services and devices relating to physical and psychological care. [MCL 769.1a.]

Unlike the CVRA, the general restitution statute permits restitution only for "*actual* medical and related professional services." (Emphasis added.) Both statutes allow a victim to recover "after-tax income loss suffered . . . as a result of" the "crime," MCL 780.766(4)(c), or the "felony," MCL 769.1a(4)(c).

The CVRA provides that the prosecution has the burden of proving by a preponderance of the evidence the amount of the victim's loss. MCL 780.767(4). "MCL 780.766(2) requires a direct, causal relationship between the conduct underlying the convicted offense and the amount of restitution to be awarded." *People v McKinley*, 496 Mich 410, 421; 852 NW2d 770 (2014). This Court has held that court-ordered restitution is not a substitute for civil damages. *People v Tyler*, 188 Mich App 83, 89-90; 468 NW2d 537 (1991). Nor is restitution properly awarded for losses paid by insurance. *People v Dimoski*, 286 Mich App 474, 480-481; 780 NW2d 896 (2009).

"The proper application of . . . statutes authorizing the assessment of restitution at sentencing is a matter of statutory interpretation, which we review de novo." *McKinley*, 496 Mich at 414-415. We review a court's calculation of a restitution amount for an abuse of discretion, *People v Gubachy*, 272 Mich App 706, 708-709; 728 NW2d 891 (2006), and its factual findings for clear error, *People v Fawaz*, 299 Mich App 55, 64; 829 NW2d 259 (2012). A trial court may abuse its discretion by blurring the distinction between a civil remedy for

damages and the criminal penalty of restitution. *People v Orweller*, 197 Mich App 136, 140; 494 NW2d 753 (1992).

III.

We first address a question raised in defendant's "motion to add issues," which the Supreme Court granted in the order remanding the case to this Court for consideration as on leave granted. In that motion, defendant adopted the issues presented by the defendant in *McKinley*, 496 Mich 410, which included that Michigan's statutory restitution scheme cannot withstand constitutional scrutiny because it permits restitution based on uncharged conduct never submitted to a jury. In *McKinley*, the Supreme Court declined to reach this constitutional question, invoking the "venerable rule of constitutional avoidance." *Id*. at 415-416. Rather, the Court focused on the plain language of MCL 780.766(2), which provides that "full restitution" may be authorized only for "any victim of the defendant's course of conduct *that gives rise to the conviction* . . . ." *Id*. at 419 (emphasis and ellipsis in original). By consulting a dictionary, the Supreme Court determined that the phrase "gives rise to" means "to produce or cause." *Id*. The Court concluded: "Only crimes for which a defendant is charged 'cause' or 'give rise to' the conviction. Thus, the statute ties 'the defendant's course of conduct' to the convicted offenses and requires as causal link between them." *Id*. In reaching this result, the Court overruled its prior decision in *People v Gahan*, 456 Mich 264; 571 NW2d 503 (1997), which had governed the trial court's restitution decision in this case.

Given the Supreme Court's order that we consider the issues raised in defendant's motion, we must address whether the trial court appropriately awarded restitution to Austin. Defendant was not convicted of CSC involving Austin. Accordingly, *McKinley* dictates that his abuse of Austin "may not be relied on as a basis for assessing restitution[.]" *Id*. at 419. Because the trial court lacked any authority to award restitution for defendant's uncharged conduct, we vacate the entirety of Austin's restitution award. In the remainder of this opinion, we therefore need only address the restitution awarded to Shane.

IV.

Defendant contends that the restitution amounts allocated for Shane's future medical and psychological treatment and "lost wages" were not authorized by MCL 780.766. The evidence supporting these awards, defendant asserts, was entirely speculative, and did not represent "easily ascertainable" or "measurable" losses.

Throughout the last four decades, this Court has repeatedly declared that restitution may encompass only those losses that are "easily ascertained and . . . a direct result of a defendant's criminal conduct." *Gubacy*, 272 Mich App at 708; see also *Tyler*, 188 Mich App at 89; *People v Pettit*, 88 Mich App 203; 276 NW2d 878 (1979). This oft-invoked rule was first established in *People v Heil*, 79 Mich App 739; 262 NW2d 895 (1977), which involved the propriety of a restitution order imposed as a condition of the defendant's probation. In *Heil*, a jury convicted the defendant of manslaughter arising from a car accident. The trial court imposed a probation sentence conditioned on "payment within 90 days of $3,000 to the victim's wife, and, additionally, payment of one half of defendant's after-tax income throughout the probation

period." *Id*. at 741. When the defendant failed to make the payments, the trial court revoked his probation. *Id.*

On appeal, the defendant argued that the damages encompassed by the restitution award "have never been measured" and that the record lacked a factual basis for the computation of the sum. *Id*. at 748. This Court agreed, characterizing the "reparational amounts ordered paid" as "essentially arbitrary." *Id*. Moreover, the Court reasoned,

> [t]he probation statute does not create a substitute for an action for civil damages. Criminal and civil liability are not synonymous. A criminal conviction does not necessarily establish the existence of civil liability. Civil liability need not be established as a prerequisite to the requirement of restitution as a probation condition; such restitution for personal injury, therefore, generally should be more limited in scope than civil damages. In the instant case we believe that restitution should encompass only those losses which are easily ascertained and measured, and which are a direct result of the defendant's criminal acts. [*Id*. at 748-749.]

Because the record failed to elucidate the "purpose of the payments" and "the manner in which they were determined," this Court reversed the order of probation revocation. *Id*. at 749. Post-*Heil*, this Court has frequently echoed that restitution awards must be rooted in damages that are "easily ascertained and measured, and which are a direct result of the defendant's criminal acts."

We discern no rational basis for continuing to embrace *Heil*'s "easily ascertained and measured" formulation, as the *Heil* court operated in an entirely different (and no longer pertinent) statutory milieu. The probation statute then in effect, MCL 771.3, permitted the sentencing court to "impose such other lawful conditions of probation, including restitution in whole or in part to the person or persons injured or defrauded, as the circumstances of the case may require or warrant, or as in its judgment may be meet and proper." In *Heil*, the Court constructed a policy-driven limitation on the breadth of restitution orders imposed as conditions of probation. Here, however, we confront specific statutory language that displaces any need for policy analysis.

First enacted in 1985, the CVRA incorporates several highly specific provisions addressing restitution. Its central, "extensive" restitution section, MCL 780.766, permits recovery of "the costs of physical and occupational therapy, as well as the cost of psychological care for the victim and the victim's family, which at the time was not an ordinary part of restitution." Van Regenmorter, *Crime Victims' Rights—A Legislative Perspective*, 17 Pepperdine L Rev 59, 67 (1989). The statute's current version authorizes sentencing courts to order payment of "an amount equal to the reasonably determined cost of medical and related professional services and devices actually incurred and reasonably expected to be incurred relating to physical and psychological care." MCL 780.766(4)(a).

Thus, the plain language of the CVRA instructs sentencing courts that the standard to be applied when calculating a restitution amount is simply one of reasonableness. "Reasonably determined" future losses (including the cost of future medical and psychological care) are subject to restitution, provided that the court finds that such losses are "reasonably expected to be incurred." This language does not suggest the need for absolute precision, mathematical

certainty, or a crystal ball. On the other hand, speculative or conjectural losses are not "reasonably expected to be incurred." Where the evidence provides a reasonably certain factual foundation for a restitution amount, the statutory standard is met.[2]

The general restitution statute, MCL 769.1a, was also enacted in 1985. As we have noted, it sets forth a different standard for recovery of the costs of psychological care. Under MCL 769.1a(4)(a), an order of restitution may require a defendant to "[p]ay an amount equal to the cost of *actual* medical and related professional services . . . relating to . . . psychological care." (Emphasis added.) Our Supreme Court has defined the word "actual" as "existing in act, fact, or reality; real." *Omdahl v West Iron Co Bd of Ed*, 478 Mich 423, 428; 733 NW2d 380 (2007) (quotation marks and citations omitted).

The trial court properly awarded restitution for the costs of the "actual" professional services rendered to Shane in the amount of $1,785. The more difficult question is whether the CVRA authorizes the award rendered by the trial court for Shane's future psychological care expenses. While future (not yet incurred) psychological expenses indisputably fall within the ambit of MCL 780.766(4)(a), the prosecution must demonstrate by an evidentiary preponderance that the claimed expenses are "reasonably expected to be incurred." Here, we find the requisite proof sorely lacking.

In his direct testimony, McGonigle hedged as to the specifics of the therapy he proposed: "I was expecting kind of a long course of treatment with possible referral to in-patient intensive therapy as needed." He was even less certain regarding the amount of money needed to address Shane's future psychological therapy needs. McGonigle admitted that the numbers he provided the court were conjectural:

> *Q*. . . . [Y]ou say they both likely have a long way to go with various modes of therapy before they are capable of following through with their goals. When you say they are both likely, *you can't provide opinions as to what they need, and in terms of actually following through with their goals though*?
>
> *A*. Yeah.
>
> *Q*. That's correct?
>
> *A*. And, I would like to comment on that if I could?

---

[2] Although tort law principles are not necessarily controlling in the interpretation and application of the CVRA, we find them instructive. "In Michigan, in order to recover damages on the basis of future consequences, it is necessary for a plaintiff to demonstrate with 'reasonable certainty' that the future consequences will occur." *Larson v Johns-Manville Sales Corp*, 427 Mich 301, 317; 399 NW2d 1 (1986), citing *Prince v Lott*, 369 Mich 606, 609; 120 NW2d 780 (1963). See also *King v Neller*, 228 Mich 15, 22; 199 NW 674 (1924) ("[O]nly such future damages can be recovered as the evidence makes reasonably certain will necessarily result from the injury sustained.").

*Q.* Absolutely.

*A.* I'm actually prohibited in my practice from giving people any solid figures about how much treatment it will take to get over their problem. And, treatment is very - - *it's really hard to get an exact amount as a prescription.*

*Q.* I'm sorry?

*A.* What I think I can do is look at, and that applies to an individual, what you can do is there is research that indicates average lengths of time that it takes to work out certain severity of problems and how much therapy is needed and that's what I relied on for my report.

*Q.* And, that goes to your next sentence, the fourth paragraph, is that what you're basically saying? Well, under the circumstances it's never proper to predict the exact amount of therapy needed for any condition?

*A.* Yeah.

*Q. And, so, you don't know what needs to be reasonably expected to be incurred, in terms of dollars?*

*A. Well, not in the actual amount, but I think it's reasonable to say there's an average and this is what you would want available for someone facing this particular kind of problem, you would want to shoot in the ballpark and that's what you could expect with the average.*

*Q.* In your next page of that you indicate in a paragraph it's likely these boys may need psychiatric care. But, do I take it you have not referred them to any psychiatrist?

*A.* No, I did not. I think partly because they wanted to opt for a more therapeutic path, they weren't really open for that notion. I think as time evolves and as they mature and grow that could change. [Emphasis added.]

On redirect examination, the prosecuting attorney read the relevant statutory language aloud, and inquired, "is it your opinion that these amounts you quoted are reasonably expected to be incurred as a result of this crime in the future?" McGonigle answered affirmatively.

The trial court acknowledged that McGonigle had provided only general, one-size-fits-all numbers, but resolved the inherent uncertainties of McGonigle's calculations by fixing on averages of McGonigle's averages:

His Exhibit 3 recommends ongoing out-patient counseling treatment, that they should be seeing a counselor twice per week and he estimates I think it was 14 to 18,000 a year. We'll use 15,000 per year, he recommends 8 to 10 years, we'll go with the 8 years then. And, that at, let's see here I said 15,000 a year times 8 years is $120,000, that would be for each of them. We'll deal with them

separately, $120,000. Also he recommended 2 long-term treatment admissions to an in-patient program and he's got one that's mentioned here, but I don't think he says that specifically has to be the one, but that's an idea of what kind of cost it would be, and that would be 42,000 approximately per admission, that's described in Exhibit 3.

McGonigle's inability to provide the court with cost figures specific to Shane renders the court's estimates fatally uncertain. An informed guess as to a victim's future psychological therapy costs does not equate with an amount "reasonably expected to be incurred." While we recognize an element of uncertainty always lurks in the background when a factfinder predicts future damages, see *Hannay v Dep't of Transp*, 497 Mich 45, 86-88; 860 NW2d 67 (2014), the evidence presented here bore only the most tenuous connection to *Shane's* needs. McGonigle admitted that the numbers he supplied the court did not specifically apply to Shane, and did not constitute "solid figures about how much treatment" Shane would reasonably require to heal. Instead, McGonigle relied on "average lengths of time" regarding other, undescribed patients, found in "research" that he failed to identify. This attenuated evidence did not suffice to demonstrate the loss that would "reasonably expected to be incurred" by *Shane* rather than an average PTSD patient.

Moreover, McGonigle did not provide the court with sufficient grounds for a reasonably accurate restitution award predicated on the "direct" harm Shane sustained "as a result of the commission of a crime." MCL 780.766(1). In *McKinley*, 496 Mich at 421, the Supreme Court emphasized that "MCL 780.766(2) requires a direct, causal relationship between the conduct underlying the convicted offense and the amount of restitution to be awarded." As noted by our Supreme Court in *McKinley*, Michigan's restitution statute instructs a sentencing court to consider "the amount of loss sustained by any victim *as a result of the offense*." *Id.*, quoting MCL 780.767(1) (emphasis in original). The phrase "as a result of" contemplates factual causation. See *People v Laidler*, 491 Mich 339, 344-345; 817 NW2d 517 (2012). "The concept of factual causation is relatively straightforward. In determining whether a defendant's conduct is a factual cause of the result, one must ask, 'but for' the defendant's conduct, would the result have occurred?" *People v Schaefer*, 473 Mich 418, 435-436; 703 NW2d 774 (2005) (citations omitted), overruled in part on other grounds, *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006). "Proximate cause", too, "is a standard aspect of causation in criminal law and the law of torts." *Paroline v United States*, 572 US__; 134 S Ct 1710, 1720; 188 L Ed 2d 714 (2014). "For a defendant's conduct to be regarded as a proximate cause, the victim's injury must be a 'direct and natural result' of the defendant's actions." *Schaefer*, 473 Mich at 436 (citations omitted). The CVRA, we conclude, permits an award only for losses factually and proximately caused by the defendant's offense; nothing in the text or structure of the statute suggests otherwise.

The record contains no evidence that defendant's conduct caused the specific future loss awarded by the trial court. Perhaps Shane will require precisely the amount of therapy that the trial court awarded. On this record, however, we have no basis for drawing a reasonable conclusion that likely he will, as the only guidance on that score was provided by McGonigle, who admitted that he was "actually prohibited . . . from giving people any solid figures about how much treatment it will take to get over their problem." Thus, we perceive no direct relationship between the psychological consequences of defendant's criminal acts toward Shane and the amount of restitution awarded. While Shane is entitled to restitution for future

psychological therapy expenses that he should reasonably expect to incur as a direct result of defendant's criminal acts, "[r]estitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extend possible, are made whole for their losses." *United States v Huff*, 609 F3d 1240, 1249 (CA 11, 2010) (quotation marks and citation omitted). McGonigle's testimony did not inform the trial court what it would take to make Shane (as opposed to any average sexual abuse victim) whole. His "ballpark" estimate may have been the best that he could offer as a licensed social worker, but no evidence suggests that a more certain estimate, predicated specifically on Shane's condition and likely future needs, was otherwise impossible to procure.

Even less evidence substantiated the trial court's $31,200 award for Shane's "lost wages." The CVRA provides for restitution of "after-tax income loss suffered by the victim as a result of the crime." The victims' father testified that both young men had been offered summer positions in Traverse City paying $400 per week (we assume pre-tax), which they had been unable to accept due to the pending court proceedings. The trial court assumed that $400 represented "the amount they could have made in the market," and that they would have worked continuously throughout the summer and for the next 78 weeks, when both obtained work in Kansas City. But lost earning capacity is not the same as "income loss."

Unfortunately, the CVRA does not provide a definition of the term "income loss." In filling in this gap, we look to definitions of the relevant terms. "Income" is "[t]he return in money from one's business, labor, or capital invested; gains, profits, salary, wages, etc." *Black's Law Dictionary* (6th ed), p 763. Here, Shane never had an "income" that defendant's conduct caused him to lose. Even assuming that Shane's loss of the ability to earn income at the ice cream store correlates to "income loss," the court made no effort to calculate after-tax income loss, as required by the statute. Furthermore, no evidence suggested that the brothers lacked the ability to earn wages for a full 78 weeks.

In summary, we vacate the trial court's order awarding Shane restitution for future therapy costs, future medication expenses, future psychiatric services, and "lost wages." The sums awarded for these categories of loss were not "reasonably determined," and do not correspond to the amounts "reasonably expected to be incurred" by Shane relating to future psychological care or after-tax income loss. We remand for correction of the order to reflect the amount paid for psychological therapy, $1,785. Should the prosecution elect to present additional testimony, the court may conduct a new restitution hearing.

V.

We now turn to the remaining issue that the Supreme Court ordered added for consideration when it remanded the case to this Court. Citing *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), *Southern Union Co v United States*, __ US __; 132 S Ct 2344; 183 L Ed 2d 318 (2012), and *Alleyne v United States*, __ US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013), defendant contends that because restitution is a form of punishment, the Sixth Amendment requires that a jury rather than a sentencing court determine the amount owed. Many other courts have considered the same argument. None have resolved this challenge in the manner defendant urges. We decline the opportunity to break new legal ground.

In *Southern Union*, 132 S Ct at 2348-2349, the United States Supreme Court held that the amount of a criminal fine imposed as part of a defendant's sentence must be determined by a jury. The Supreme Court's opinion in *Apprendi* dictated this result, the Court explained, as "*Apprendi*'s 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.'" *Id*. at 2350. A criminal fine and restitution are not synonymous, however. A plethora of federal circuit courts of appeal have held that "judicial factfinding to determine the appropriate amount of restitution under a statute that does not prescribe a maximum does not implicate a defendant's Sixth Amendment rights." *United States v Bengis*, 783 F3d 407, 413 (CA 2, 2015) (citing cases from three other circuits). A few other circuits have rejected defendant's argument based on a conclusion that restitution is a civil rather than a criminal penalty, negating *Apprendi*'s relevance. *United States v Kieffer*, 596 Fed Appx 653, 664 (CA 10, 2014) (citing additional cases). Still other courts consider restitution a criminal penalty but have nonetheless concluded that the Sixth Amendment erects no obstacle to judicial fact-finding as to the amount owed:

> Restitution is, at its essence, a restorative remedy that compensates victims for economic losses suffered as a result of a defendant's criminal conduct. In this sense, even though restitution is a criminal punishment, it does not transform a defendant's punishment into something more severe than that authorized by pleading to, or being convicted of, the crime charged. Rather, restitution constitutes a return to the status quo, a fiscal realignment whereby a criminal's ill-gotten gains are returned to their rightful owner. In these circumstances, we do not believe that ordering a convicted defendant to return ill-gotten gains should be construed as increasing the sentence authorized by a conviction pursuant to *Booker*.[3] [*United States v Leahy*, 438 F3d 328, 338 (CA 3, 2006).]

We are unaware of any state or federal courts that have adopted defendant's constitutional argument, and find it unavailing.[4]

We vacate the order of restitution entered by the trial court. On remand, the prosecution may seek leave from the trial court to conduct a second restitution hearing. Regardless of the result of that hearing, no restitution shall be awarded to Austin. Should the prosecution elect

---

[3] In *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed2d 621 (2005), the United States Supreme Court struck down the mandatory application of the federal sentencing guidelines as violative of the Sixth Amendment.

[4] We acknowledge that our Supreme Court recently decided in *People v Lockridge*, ___ Mich ___; ___ NW2d ___ (Docket No. 149073, decided July 29, 2015), that *Apprendi* as extended by *Alleyne* renders Michigan's sentencing guidelines "constitutionally deficient" to the extent they "require judicial fact-finding beyond facts admitted by the defendant or found by the jury" to score variables that mandate an increased floor for the minimum sentencing guidelines range. Slip op at 1-2. Nothing in *Lockridge* suggests that its reasoning encompasses restitution orders entered in conjunction with sentencing.

against convening another hearing, the trial court shall enter an order of restitution awarding Shane $1,785.  We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto