*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFREY ALAN STOLTZ,

        Defendant-Appellant.

UNPUBLISHED
July 20, 2023

No. 363425
Kent Circuit Court
LC No. 18-003731-FH

Before: M. J. KELLY, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

In 2018, a jury convicted defendant of two counts of larceny by conversion of more than $20,000, MCL 750.362; MCL 750.356(2)(a); and four counts of writing or a delivering an insufficient funds check of $500 or more, MCL 750.131(3)(c). The trial court sentenced defendant above the recommended guidelines range and ordered defendant to pay restitution totaling $287,998.62. Defendant appealed to this Court, and a panel of this Court affirmed defendant's convictions but remanded for (1) an evidentiary hearing regarding restitution and (2) resentencing.[1] On remand, the trial court imposed the same upward departure sentence, concurrent terms of 6 to 10 years' imprisonment for his larceny convictions. The trial court resentenced defendant to time served for his remaining convictions and ordered defendant to pay restitution totaling $205,444.76. Defendant appeals as of right. For the reasons stated in this opinion, we vacate defendant's sentences and the restitution award, and we remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In defendant's previous appeal, a panel of this Court summarized the basic facts of this case as follows:

---

[1] *People v Stoltz*, unpublished per curiam opinion of the Court of Appeals, issued March 12, 2020 (Docket No. 346713).

Defendant was a licensed builder, and the sole owner of a construction company called Emry Custom Homes and Remodeling, LLC. His convictions arise from his failure to complete work, or refund money, in connection with renovations on two houses in East Grand Rapids. For the first project, on Hall Street, defendant received $122,000; and for the second project, on Plymouth Avenue, defendant received $64,445. Although defendant did some work on the homes, he left the projects unfinished and used the money for his own purposes, including payment of old business debts, refunds to past customers, and payment of personal expenses, including a family vacation, dining, clothing, and other merchandise. In connection with the projects, defendant also failed to pay some of the suppliers and subcontractors for work they completed or materials they supplied. He also wrote at least four checks for insufficient funds of $500 or more, resulting in his convictions for writing bad checks. Other-acts evidence indicated that, on at least three other occasions, defendant accepted payment for projects but failed to complete the work. After the victims in this case reported the matter to police and a news broadcast aired, defendant left Michigan and moved his family to Illinois.

Defendant testified in his own defense. He delineated his 22 years of experience as a builder. After a prior career working in sales, defendant started his own construction company, but did not have any capital, business loans, or line of credit to fund the company. He acquired customers through friends and his children's school. Defendant claimed that he always intended to complete the construction contracts and did not intend to deprive his customers of their money. However, he believed that once he was paid by his customers he was entitled to use those funds as corporate money. Therefore, he paid himself as well as purchased items necessary to maintain his business, such as gas for his work vehicle, work clothes, and materials and tools. However, defendant also admitted that non-work related charges were made by the business. Additionally, he acknowledged that he lied to his customers about the status of the project, the ordered materials, and payments to subcontractors.

The defense also presented the expert testimony of Gary Byker, a licensed builder and self-employed contractor. Byker testified that defendant "massively underbid" the projects. The jury convicted defendant as charged. [*People v Stoltz*, unpublished per curiam opinion of the Court of Appeals, issued March 12, 2020 (Docket No. 346713), pp 1-2.]

At the original sentencing in 2018, the trial court departed upward and sentenced defendant to 6 to 10 years' imprisonment for his larceny-by-conversion convictions and 1 to 2 years' imprisonment for passing bad checks. The trial court also ordered defendant to pay restitution totaling $287,998.62. Defendant appealed to this Court as of right, raising a variety of challenges to his convictions and sentences. The panel affirmed defendant's convictions, but remanded for an evidentiary hearing on restitution and ordered resentencing. *Id*. at 12-18.

On remand, the trial court held an evidentiary hearing on restitution. The prosecutor sought restitution for the victims totaling $205,444.40, which included $100,283.76 for the Plymouth

Avenue homeowners and $105,160.64 for the Hall Street homeowners. The prosecutor conceded on remand that various items previously awarded were not compensable as restitution. To support the restitution request, the prosecutor submitted two charts—one for the Hall Street homeowners and one for the Plymouth Avenue homeowners—detailing the amounts that they sought in restitution. At the hearing, the homeowners testified that the charts accurately reflected their losses. Defendant argued that he performed a significant amount of work on the projects and that the homeowners had not adequately accounted for the value of this work in their restitution requests. He relied again on Byker's trial testimony and previous submissions. Defendant asserted that the homeowners sought a windfall. At the conclusion of the hearing, the trial court credited the prosecutor's proofs and granted the full amount of restitution requested.

In May 2022, the trial court resentenced defendant, again departing upward from the revised recommended guideline range, to 6 to 10 years' imprisonment for his larceny-by-conversion convictions to be served concurrently. The trial court resentenced defendant to time served for his remaining convictions and gave him credit for time served, 1,396 days. The trial court articulated its reasons for defendant's upward departure sentence focusing on defendant's numerous lies and acts of deception during the time when the victims were vulnerable because their homes had been torn apart, and the amount of restitution.

## II. ANALYSIS

### A. RESTITUTION

#### 1. STANDARD OF REVIEW

We review a trial court's award of restitution for an abuse of discretion, and the trial court's findings of fact are reviewed for clear error. *People v Fawaz*, 299 Mich App 55, 64; 829 NW2d 259 (2012). "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Matzke*, 303 Mich App 281, 284; 842 NW2d 557 (2013) (quotation marks and citation omitted). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). To the extent review of a restitution award involves interpretation of the Crime Victim's Rights Act (CVRA), MCL 780.751 *et seq*., our review is de novo. *Fawaz*, 299 Mich App at 64.

#### 2. RESTITUTION RESTORES WHAT VICTIMS LOST

On appeal, defendant challenges the amount of restitution imposed and asserts that he was not afforded a fair offset for the work he performed on the victims' homes. Not all defendant's restitution challenges have merit, but we conclude that the trial court abused its discretion by awarding the victims more than the amounts to which they are entitled.

"Crime victims have a right to restitution under both the Michigan Constitution and Michigan statutory law." *People v Wahmhoff*, 319 Mich App 264, 269; 900 NW2d 364 (2017). The CVRA provides for a mandatory award of restitution for crime victims under MCL 780.766(2), as follows:

Except as provided in subsection (8), when sentencing a defendant convicted of a crime, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. . . .

Relevant to this case, MCL 780.766(3) provides in relevant part:

(3) If a crime results in damage to or loss or destruction of property of a victim of the crime or results in the seizure or impoundment of property of a victim of the crime, the order of restitution shall require that the defendant do 1 or more of the following, as applicable:

(a) Return the property to the owner of the property or to a person designated by the owner.

(b) If return of the property under subdivision (a) is impossible, impractical, or inadequate, pay an amount equal to the greater of subparagraph (*i*) or (*ii*), less the value, determined as of the date the property is returned, of that property or any part of the property that is returned:

(*i*) The fair market value of the property on the date of the damage, loss, or destruction. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value.

(*ii*) The fair market value of the property on the date of sentencing. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value.

Restitution is intended to be remedial and "to shift the burden of losses arising from criminal conduct—as much as practicable—from crime victims to the perpetrators of the crimes." *Fawaz*, 299 Mich App at 65 (quotation marks and citation omitted). The amount of restitution must be based on the actual loss suffered by the victim. *Id.* "The restitution calculation cannot be premised on speculative or conjectural loss, but, rather, the evidence must support a reasonably certain factual foundation for the amount." *In re White*, 330 Mich App 476, 483; 948 NW2d 643 (2019). Moreover, "[r]estitution is not designed to provide a windfall for crime victims, but was created to ensure that victims are made whole for their losses to the extent possible." *Id.* at 480. The prosecutor bears the burden of establishing the amount of restitution by a preponderance of the evidence. MCR 6.425(D)(2)(b); *Fawaz*, 299 Mich App at 65.

"When determining the amount of restitution to award a victim, the focus is consistently not on what a defendant took, but what a victim lost because of the defendant's criminal activity." *In re White*, 330 Mich App at 483 (quotation marks and citation omitted). "MCL 780.766(2) requires a direct, causal relationship between the conduct underlying the convicted offense and the amount of restitution to be awarded." *People v McKinley*, 496 Mich 410, 421; 852 NW2d 770

(2014). Further, restitution is not a substitute for civil damages. *People v Orweller*, 197 Mich App 136, 140; 494 NW2d 753 (1992). "A trial court may abuse its discretion by blurring the distinction between a civil remedy for damages and the criminal penalty of restitution." *People v Corbin*, 312 Mich App 352, 361; 880 NW2d 2 (2015).

### a. THE PLYMOUTH AVENUE HOMEOWNERS

Regarding the Plymouth homeowners, the trial court awarded them a total of $100,283.76. The Plymouth homeowners paid defendant a total of $64,445, and by their calculations, defendant performed a total of $14,350 worth of work on their home. Crediting defendant for this work, the Plymouth homeowners sought the return of $50,095. However, they also sought an *additional* $50,188.76, which is the amount they paid other contractors to finish their home renovation. The trial court awarded them the combined amounts. In doing so, the trial abused its discretion by awarding them more than restitution.

Significant to our conclusions in this regard, in defendant's previous appeal, the panel addressed the Plymouth homeowners' restitution request in a footnote, as follows:

> Notably, the Plymouth Ave—who paid defendant approximately $64,000—requested the return of $50,000 *and* an additional $59,289.74 to have him pay to complete the house. "[R]estitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *Corbin*, 312 Mich App at 370 (quotation marks and citation omitted). Absent a more specific explanation for this restitution request, it is challenging to see how making them whole would involve defendant refunding their money for work not completed and at the same time paying to complete the project. [*Stoltz*, unpub op at 14 n 7.]

The trial court's award on remand to the Plymouth homeowners totaling $100,283.76, went beyond restitution. The Plymouth homeowners were not entitled to a refund and payment to complete the same project, because the goal of restitution is to make crime victims whole for their losses. *Corbin*, 312 Mich App at 370. Had defendant performed as promised rather than converting their payments for his own use, the Plymouth homeowners would have had their home remodeled for $64,445. Instead, defendant received $64,445 from them but performed only $14,350 worth of work on their home. Subtracting the work performed from the amount paid, the Plymouth homeowners were entitled to a refund of $50,095.

Refunding $50,095, however, would be slightly inadequate to compensate the Plymouth homeowners for their loss because it would not be enough to complete the project, which cost them $50,188.76. The evidence supports the conclusion that the cost to complete the project resulted from defendant's conversion of their funds because, as part of his scheme to obtain money from the Plymouth homeowners, defendant began work on the Plymouth homeowners' home, leaving them in a position such that they had to complete the project. To the extent that the amount taken by defendant was inadequate to complete the project, the victims are entitled to the additional $93.76. If no work had begun, returning the money would be restitution in full. The evidence at trial, however, indicated that defendant tore apart the Plymouth home and left the house in a state

of disrepair that required completion of the project to make the home safe and habitable again. Restitution in this case requires compensating the Plymouth homeowners $50,188.76, which provides for the return of the converted funds, accounts for the work performed by defendant, and leaves the Plymouth homeowners with the means to complete their remodel. This amount makes the Plymouth homeowners whole and provides them with what they lost and nothing more. See *In re White*, 330 Mich App at 483. This comports with MCL 780.766.

Defendant argues that the trial court erred by failing to fully credit defendant for the work that he performed on the Plymouth homeowners' home. Regarding defendant's work, in defendant's previous appeal, the panel concluded that defendant was entitled to a determination of the value that defendant provided to "the homeowners in the form of services and products, and that amount, if any, should be offset against the amount of restitution." *Stoltz*, unpub op at 14. The rationale being that funds used by defendant to improve the property were, in effect, "returned" to the homeowners for purposes of calculating restitution. See *United States v Shepard*, 269 F3d 884, 887-888 (CA 7, 2001). On remand, relying on the Plymouth homeowners' calculations, the trial court concluded that defendant performed $14,350 worth of work on the home, which was, as noted, offset against the refund that defendant was ordered to pay the Plymouth homeowners. Defendant challenges the $14,350 amount on two bases.

First, relying on the opinions of a defense expert, Byker, defendant asserts that his work was worth considerably more than $14,350. According to the evidence at the restitution hearing, the $14,350, however, was calculated based on the value assigned for the work in defendant's contract with the Plymouth homeowners. Although not necessarily dispositive on the issue of value, the contract price is evidence of the value of defendant's services. See generally *Ordon v Johnson*, 346 Mich 38, 49; 77 NW2d 377 (1956) (recognizing that a contract, even a void contract, may be used as evidence for the purpose of showing the value of services and estimating damages). The weight to give this evidence, and the credibility of Byker's testimony on the value of defendant's services, were issues for the trial court. See *People v Passage*, 277 Mich App 175, 177; 743 NW2d 746 (2007). Given the contract price for defendant's services, the trial court did not err by crediting the Plymouth homeowners' calculations and valuing defendant's work on their home at $14,350. See *id*.

Second, defendant also contends that the Plymouth homeowners did not fully acknowledge the work that he performed on their home. According to defendant, a comparison to the Plymouth homeowners' own trial testimony supports that he performed additional work for which he was not credited. Defendant's argument on this point, however, is cursory to the point of being abandoned. He does not brief the issue on appeal but refers this Court to his restitution brief in the trial court, which he asserts provides a list of the work that he performed; this list is, in turn, simply a long list of string citations to the trial transcript. Defendant leaves it to this Court to actually conduct a comparison of the Plymouth homeowners' trial testimony to the work for which he was given credit at the restitution hearing. It is not enough for an appellant to simply "announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (quotation marks and citation omitted). By failing to identify with any specificity work that he completed for which he was not credited at the restitution hearing, defendant has abandoned this argument. See *id*.

Defendant's other challenges to the restitution awarded the Plymouth homeowners lack merit, and deferring to the trial court's factual findings and credibility assessments, the record in this case supports a restitution award in the amount of $50,188.76. For these reasons, we vacate the trial court's restitution award to the Plymouth homeowners and remand for further proceedings consistent with this opinion.

b.  THE HALL STREET HOMEOWNERS

Respecting the Hall Street homeowners, deferring to the trial court's factual findings and credibility assessments, the record indicates that they paid defendant $121,905, and on remand, the trial court awarded restitution to them in the amount of $105,160.64. On remand, the prosecutor never attempted to calculate the amount that defendant should refund for work not completed. Given the payment to defendant of $121,905, and given trial testimony from the Hall homeowners that defendant completed an estimated 40% to 50% of the project—not accounting for the fact that some work would likely be more expensive than other work—renders the amount converted by defendant somewhere between $60,952.50 and $73,143. Although the prosecutor's briefing and argument were sparse, it appears that the prosecutor believed that a return of the money under MCL 780.766(3)(a) would be inadequate and that, instead, the measure of restitution should be the cost to complete the project. Like the Plymouth homeowners, the evidence supports the conclusion that the cost to complete the project resulted from defendant's conversion of their funds because, as part of his scheme to obtain money from the Hall homeowners, defendant began work on the Hall homeowners' home, but left them in a position requiring them to complete the project.[2] By the Hall homeowners' calculations, the "total cost to finish the project" as set forth in their chart—minus items that are not compensable as restitution—amounts to $76,767.64. As with the Plymouth homeowners, providing the Hall homeowners restitution in the amount to finish the project will make them whole—they will receive what they lost in the form of a completed home. See *In re White*, 330 Mich App at 483. The record in this case supports restitution in the amount of $76,767.64.

Defendant correctly points out that the Hall homeowners are not entitled to an additional $28,393 for "items taken out of scope," which appear to be miscellaneous items that defendant did not complete and that the Hall homeowners elected not to have anyone else complete when they finished their home remodel. Ordering defendant to pay $76,767.64 for completion of the project makes the Hall homeowners whole by providing them with a habitable home and compensates them for the amount that defendant converted. Further, from the paucity of evidence presented by the prosecutor at the restitution hearing, it is not entirely clear how these "out of scope" items were valued. There was no evidence of estimates from other contractors for these items, and no other explanation was given for how the Hall homeowners concluded that these items were worth over

---

[2] If no work had begun, returning the money would be restitution in full. In this case, however, as with the Plymouth homeowners, the evidence at trial supported that defendant began tearing apart the Hall homeowners' home, leaving the house in a state of disrepair that required completion of the project to make the home safe and habitable again. Again, we do not suggest that restitution in a case involving larceny by conversion in the construction context is always going to involve paying for completion of the project.

$28,000. Restitution cannot be "premised on speculative or conjectural loss, but, rather, the evidence must support a reasonably certain factual foundation for the amount." *In re White*, 330 Mich App at 483. The prosecutor failed to provide a factual foundation for these amounts, and they should have been disallowed. See *id*.

Defendant also contends respecting the Hall homeowners that the trial court failed to afford him the full value of the work that he performed as an offset to the restitution awarded. Defendant argues that the Hall homeowners did not fully acknowledge the work that he performed on their home and that a comparison to their trial testimony would reveal additional work for which defendant was not credited. As with the Plymouth homeowners, defendant has abandoned this argument by failing to adequately brief it and instead leaving it to this Court to wade through his string cites to the trial transcript to conduct a comparison between the Hall homeowners' trial testimony and the restitution request. See *Waclawski*, 286 Mich App at 679. By failing to identify with any specificity work that he completed for which he was not credited at the restitution hearing, defendant has abandoned this argument. See *id*.

Defendant also contends that the Hall homeowners afforded him no value for the work that he performed and that the trial court, therefore, erred by relying on the Hall homeowners' calculations rather than crediting Byker's expert testimony on the value of defendant's work. One of the Hall Street homeowners testified, however, that defendant did receive credit for the value of his work. She explained that defendant's work was considered by the contractors who bid to finish the project. In other words, the contractors who bid to finish the project were not redoing defendant's work; they started at the state of the project as defendant left it. The record reflects that the Hall homeowners afforded defendant value for his work by only seeking the costs to finish items. The weight to give the homeowners' testimony as compared to Byker's calculations of value was an issue for the trial court. See *Passage*, 277 Mich App at 177. Deferring to the trial court's factual findings and credibility assessments, the Hall homeowners are entitled to a total restitution award of $76,767.64.

## B. RESENTENCING

On appeal, defendant argues that he is entitled to resentencing because the trial court resentenced defendant without obtaining a reasonably updated presentence investigation report (PSIR). We agree.[3]

The PSIR "is a vital and necessary component of this effort to prescribe informed, individualized punishment in felony matters." *People v Triplett*, 407 Mich 510, 514; 287 NW2d 165 (1980). It provides information related to "the antecedents, character, and circumstances" of the individual being sentenced to ensure "that the punishment is tailored not only to the offense, but also to the offender." *People v Miles*, 454 Mich 90, 97; 559 NW2d 299 (1997). Indeed, a

---

[3] Defendant also challenges the reasonableness and proportionality of his sentences. Given our conclusion that resentencing is warranted under *People v Triplett*, 407 Mich 510; 287 NW2d 165 (1980), we decline to address that issue.

PSIR is a *mandatory* component of sentencing; a sentence may not be imposed without the aid of a PSIR. *Triplett*, 407 Mich at 514.

Significant to this case, at a resentencing, "a reasonably updated" PSIR must be utilized, and such a report "must be complete, accurate, and reliable." *Id*. at 515. The requirement of a reasonably updated report is "a necessary corollary to the principle that sentencing must be individualized and tailored to the particular circumstances of the case and the offender at the time of sentencing." *Id*. Conduct while in prison pending resentencing is among the information that should be included in an updated PSIR. See *id*. at 516.

> The sentencing court should make every effort to individualize sentences in order to further the goal of rehabilitation. In this regard a defendant's conduct while in prison may shed considerable light on the prospect of rehabilitation. An updated presentence report which includes prison conduct would describe the defendant's most recent behavior and would be a valuable tool in resentencing. Such a procedure would not be a burden on the probation department since records are kept at prison which could easily be made available. [*Id*. (quotation marks and citation omitted).]

For example, in *Triplett*, the court resentenced the defendant in 1976 based on a PSIR prepared in 1972. *Id*. at 512. The only update made to the report in anticipation of the 1976 resentencing was "the inclusion of a brief cover sheet," which provided "no further insight into defendant's conduct since 1972." *Id*. at 513. The defendant objected to the staleness of the report, noting that it had not been "updated to reflect defendant's subsequent prison conduct and alleged progress toward rehabilitation." *Id*. at 512. Holding that a reasonably updated PSIR was a requirement for resentencing, our Supreme Court vacated the defendant's sentence and remanded for resentencing. *Id*. at 515-516.

In this case, the trial court resentenced defendant in May 2022 without utilizing a reasonably updated PSIR. Under *Triplett*, this error warrants resentencing. The PSIR in this case was prepared in anticipation of defendant's original sentencing in November 2018. The information, therefore, was $3^{1}/_{2}$ years old. The only update to the PSIR was a one-page document amending the amount of restitution and jail credit. As with the update in *Triplett*, 407 Mich at 512-513, this document provided "no further insight into defendant's conduct" in the last few years, including no information about his conduct while in prison, see *id*. at 516. In a sentencing memorandum, defendant specifically objected to the staleness of the PSIR, including the fact that it omitted information about his conduct while in jail, which defense counsel advised the court had been positive. See *id*. at 512; see also *People v Crook*, 123 Mich App 500, 503; 333 NW2d 317 (1983) (remanding for resentencing with an updated PSIR when the defendant's allocution at sentencing suggested that there were "various changed circumstances"). Defendant's behavior while in prison "may shed considerable light" on his prospects for rehabilitation, and by failing to consider up-to-date information about defendant's conduct, the trial court lacked necessary information to enable it to tailor defendant's sentence both to the offense and the offender. See *Triplett*, 407 Mich at 515-516. Therefore, we vacate defendant's sentences and remand for resentencing utilizing an updated PSIR.

## C.  REQUEST FOR A NEW JUDGE

Defendant requests that, if we remand for further proceedings, a new judge should be assigned.  Although we do not find evidence of bias or prejudice, on remand the case shall be assigned to a different judge to preserve the appearance of justice.

When remanding for resentencing, this Court has the authority to order that a different judge should carry out the resentencing on remand.[4]  *People v Dixon-Bey*, 340 Mich App 292, 303; 985 NW2d 904 (2022).  To determine whether to reassign a case to a new judge on remand, this Court considers three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.  [*People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019) (quotation marks and citation omitted).]

Applying these factors in this case, we conclude that the circumstances of this case warrant remand to a different judge.  The record indicates that the trial court revisited the issues presented after remand by this Court and erred as explained previously in this opinion.  The trial court could have difficulty putting aside previously expressed views or findings.  Further, preserving the appearance of justice and fairness outweighs considerations of waste and duplication.  See *People v Evans*, 156 Mich App 68, 72; 401 NW2d 312 (1986).  Our decision to remand to a new judge neither expresses nor implies "any personal criticism of the trial judge."  See *id*.

---

[4] This authority derives not from the court rules governing recusal and disqualification, i.e., MCR 2.003.  Instead, this authority is a product of this Court's power, "in its discretion, and on the terms it deems just," to "enter any judgment or order or grant further or different relief as the case may require" under MCR 7.216(A)(7).  Cf. *Liteky v United States*, 510 US 540, 554; 114 S Ct 1147; 127 L Ed 2d 474 (1994) ("Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances,' 28 USC § 2106.").  For purposes of preservation, this means that a request to remand to a new judge, in the event that there is an error warranting a remand, may be raised in the first instance on appeal.  See *United States v Tucker*, 78 F3d 1313, 1323-1324 (CA 8, 1996) (concluding that a request for reassignment in the event of a remand, made for the first time in an appellant's brief, was a proper way to raise the issue for the court's review).  In short, defendant properly raised the issue for our review by raising it in his appellate brief.  See *id*.  Even if defendant was required to take some action in the trial court to preserve this issue, we note that defendant moved several times in the trial court for the disqualification of the trial judge.  See *In re Forfeiture of $5300*, 178 Mich App 480, 497; 444 NW2d 182 (1989).

Vacated and remanded to a different judge for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Douglas B. Shapiro