*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFREY ALAN STOLTZ,

        Defendant-Appellant.

UNPUBLISHED
March 12, 2020

No. 346713
Kent Circuit Court
LC No. 18-003731-FH

Before: MURRAY, C.J., and METER and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for two counts of larceny by conversion of more than $20,000, MCL 750.362; MCL 750.356(2)(a); and four counts of writing or delivering an insufficient funds check of $500 or more, MCL 750.131(3)(c) (writing bad checks). He was sentenced to concurrent terms of 6 to 10 years' imprisonment for his larceny by conversion convictions and 1 to 2 years' imprisonment for the writing bad checks convictions. Further, defendant was ordered to pay restitution in the amount of $287,998.62. Finding no errors warranting reversal, we affirm defendant's convictions, but vacate defendant's sentences and the restitution award and remand for further proceedings.

## I. BASIC FACTS

Defendant was a licensed builder, and the sole owner of a construction company called Emry Custom Homes and Remodeling, LLC. His convictions arise from his failure to complete work, or refund money, in connection with renovations on two houses in East Grand Rapids. For the first project, on Hall Street, defendant received $122,000; and for the second project, on Plymouth Avenue, defendant received $64,445. Although defendant did some work on the homes, he left the projects unfinished and used the money for his own purposes, including payment of old business debts, refunds to past customers, and payment of personal expenses, including a family vacation, dining, clothing, and other merchandise. In connection with the projects, defendant also failed to pay some of the suppliers and subcontractors for work they completed or materials they supplied. He also wrote at least four checks for insufficient funds of $500 or more, resulting in his convictions for writing bad checks. Other-acts evidence indicated that, on at least three other

occasions, defendant accepted payment for projects but failed to complete the work. After the victims in this case reported the matter to police and a news broadcast aired, defendant left Michigan and moved his family to Illinois.

Defendant testified in his own defense. He delineated his 22 years of experience as a builder. After a prior career working in sales, defendant started his own construction company, but did not have any capital, business loans, or line of credit to fund the company. He acquired customers through friends and his children's school. Defendant claimed that he always intended to complete the construction contracts and did not intend to deprive his customers of their money. However, he believed that once he was paid by his customers he was entitled to use those funds as corporate money. Therefore, he paid himself as well as purchased items necessary to maintain his business, such as gas for his work vehicle, work clothes, and materials and tools. However, defendant also admitted that non-work related charges were made by the business. Additionally, he acknowledged that he lied to his customers about the status of the project, the ordered materials, and payments to subcontractors.

The defense also presented the expert testimony of Gary Byker, a licensed builder and self-employed contractor. Byker testified that defendant "massively underbid" the projects. The jury convicted defendant as charged.

## II. SUFFICIENCY

Defendant first argues that the prosecutor failed to present sufficient evidence to support his two convictions for larceny by conversion and the trial court erred in denying his motion for directed verdict. Defendant maintains that the homeowners gave him the funds in question without any specific restrictions, and absent limitations on the use of the funds, defendant asserts that the homeowners passed both title and possession to defendant at the time of payment. We disagree.

When reviewing a sufficiency challenge, "we review de novo the trial evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that all the elements of the offense were proved beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). The same standard for reviewing the sufficiency of the evidence applies to a motion for a direct verdict; however, when reviewing a trial court's decision on a motion for a directed verdict, only the evidence presented up to the time the motion is made is considered. *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001). In this case, defendant did not move for a directed verdict until after the close of the defense proofs, and there was no rebuttal evidence from the prosecutor.

Defendant was convicted under MCL 750.362, which states:

> Any person to whom any money, goods or other property, which may be the subject of larceny, shall have been delivered, who shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money or other property, or any part thereof, shall be

deemed by so doing to have committed the crime of larceny and shall be punished as provided in the first section of this chapter.

The elements of larceny by conversion are:

(1) the property at issue must have some value, (2) the property belonged to someone other than the defendant, (3) someone delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means, (4) the defendant embezzled, converted to his own use, or hid the property with the intent to embezzle or fraudulently use it, and (5) at the time the property was embezzled, converted, or hidden, the defendant intended to defraud or cheat the owner permanently of that property. [*People v Mason*, 247 Mich App 64, 72; 634 NW2d 382 (2001) (quotation marks and citations omitted).]

In this case, defendant only challenges the second element; that is, defendant maintains that he cannot be guilty of conversion because he became the owner of the money when it was given to him by the homeowners. Relevant to defendant's arguments, "[l]arceny by conversion constitutes a crime against possession and not against title; one cannot convert his own funds." *People v Spencer*, 320 Mich App 692, 701; 909 NW2d 17 (2017) (quotation marks and citation omitted). For this reason, "when an owner intends to part with his or her title to property as well as possession, a charge of larceny by conversion is not viable." *Id.* Whether an owner intends to part with title requires an examination of "the facts surrounding each complainant's transfer of money to [the defendant] to determine whether they each intended to retain title to the money." *Id.* at 702 (quotation marks and citation omitted).

In this case, viewing the evidence in a light most favorable to the prosecutor, both sets of homeowners entered into fixed-price contracts with defendant that required advance payments to defendant for agreed-upon designated purposes, namely the remodeling of their homes. With the exception of the $5,500 general contractor fee for defendant under the Plymouth Ave contract, nothing indicated that defendant could use the money as he pleased irrespective of whether he performed any work. To the contrary, the contracts specified the work to be performed on each home. Given the homeowners' respective contracts for specific home-remodeling services, a reasonable fact-finder could conclude that, in prepaying defendant for materials and services, the homeowners intended to retain title to the money until such time as the work was actually completed. Indeed, "[i]t would make little sense for each of these [homeowners] to intend to give their hard-earned money to [defendant] to keep irrespective of whether they ever received the home for which they bargained, especially with no contractual provision to that effect." *Mason*, 247 Mich App at 74-76.

In addition to the contracts and the initial advance payments to defendant, the facts surrounding the victims' subsequent payments to defendant provide further support for the assertion that the homeowners did not pass title to their money to defendant at the time of payment irrespective of whether defendant performed the work in question. For example, to obtain additional draws from the loan funds for the Hall Street project, which were held by a title company, defendant had to submit sworn statements, detailing how he intended to use the funds in question. According to the testimony at trial, defendant listed the services to be provided and, in some cases, the specific subcontractors to be utilized. Clearly, this money from the loan

proceeds did not pass to defendant without conditions; rather, the money was given to defendant because he specifically agreed to use the funds for designated purposes. As with the initial prepayment to defendant, reasonable fact-finders could conclude that owners of the Hall Street property intended to retain title to the subsequent draws until that money was utilized for its specific earmarked purposes.

Likewise, regarding the owners of the Plymouth Ave property, their contract called for a second advance payment when the project reached the "drywall stage." However, before this stage occurred, defendant asked for an early payment of $15,000. According to testimony at trial, in this request, defendant detailed the manner in which he had supposedly used the initial payment and he then detailed how he intended to use the next $15,000. Again, given this evidence, a reasonable fact-finder could conclude that, in transferring possession of their money to defendant for future work, the owners of the Plymouth Ave property did not pass title to the money; rather, they intended to retain title to the money until the money was actually used to pay for the work in question.

In sum, viewing the evidence in a light most favorable to the prosecution, a reasonable fact-finder could conclude that title to the homeowners' advance payments did not pass to defendant but that the homeowners instead intended to retain title to the money until it was utilized to pay for the remodeling of their homes. The trial court did not err by denying defendant's motion for a directed verdict, and sufficient evidence was presented to support defendant's convictions.

## III. MOTION TO REASSIGN

Next, defendant contends that Chief Judge Mark A. Trusock erred by denying defendant's motion to reassign the case to Judge J. Joseph Rossi. Specifically, defendant asserts that the prosecution dismissed the case before Judge Rossi and refiled with the hope that the case would be assigned to a judge inclined to impose harsher sentences as evidenced by its failure to comply with local administrative rules. In light of the record, we disagree.

Whether a prosecutor engaged in misconduct depriving defendant of due process by filing repeated prosecutions presents a question of constitutional law, which this Court reviews de novo. *People v Dunbar*, 463 Mich 606, 615; 625 NW2d 1 (2001), overruled in part on other grounds by *People v Jackson*, 483 Mich 271; 769 NW2d 630 (2009). "This Court has recognized that repeated prosecutions of a defendant for the same offense may violate the defendant's right to due process." *People v Vargo*, 139 Mich App 573, 578; 362 NW2d 840 (1984). "Among the factors to be considered in determining whether a due process violation has occurred are the reinstitution of charges without additional, noncumulative evidence not introduced at the first preliminary examination, the reinstitution of charges to harass, and judge-shopping to obtain a favorable ruling." *Id*. The chief judge has the discretion to reassign a case for good cause. *Nat'l Waterworks, Inc v Int'l Fidelity & Surety, Ltd*, 275 Mich App 256, 258; 739 NW2d 121 (2007); see also MCR 8.111(C). The decision to reassign a case is reviewed for an abuse of discretion. *Nat'l Waterworks, Inc*, 275 Mich App at 258. An abuse of discretion occurs when the trial court selects an outcome that is outside the range of reasonable and principled outcomes. *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013).

At the hearing on the motion to reassign, defense counsel argued that the prosecutor failed to notify the trial court that defendant's case was dismissed and subsequently re-filed,[1] and therefore, the case should be assigned to the original trial judge. It was also asserted that at a prior hearing, a prosecutor stated "well, if we refile maybe we'll get Judge Trusock," and the defense claimed he was a judge known to impose harsher penalties. The prosecutor acknowledged the local administrative order and explained the failure to apprise the court of the prior criminal case was the court's existing knowledge of it in light of his prior decision on a motion to recuse. Further, the prosecutor stated that preference for a judge in light of known policies or inclinations did not constitute judge shopping.

Chief Judge Trusock stated that he reviewed the underlying criminal case. He noted that the underlying criminal case commenced on May 19, 2017, and there were eight adjournments and three different trial dates before Judge Rossi. He further noted that after Judge Rossi declined the prosecutor's request to amend the dates in the information, the prosecutor filed a motion to recuse, and that he, as the chief judge, had denied the motion. The prosecutor had a right to *nolle prosequi* the case, and it was assigned by random draw to Chief Judge Trusock and bound over on April 27, 2018. The trial date was scheduled for September 17, 2018. However, present defense counsel substituted into the case a mere three weeks before trial and Chief Judge Trusock found that defense counsel, not the prosecutor was engaged in judge shopping, because he waited until August 24, 2018, to seek reassignment. Finally, with regard to the circuit court's local administrative rules, Chief Judge Trusock stated that they were not followed when good cause and due process required the contrary. Chief Judge Trusock noted that he had the power of caseload management, and he could preside over the trial in three weeks as scheduled because it would be four to eight months before a trial date was set with Judge Rossi. Accordingly, the defense motion to reassign was denied.

In light of this record, we cannot conclude that Chief Judge Trusock abused his discretion by denying the defense motion to reassign. This claim of error is without merit.

## IV. OTHER-ACTS EVIDENCE

Defendant also argues that the trial court abused its discretion by admitting other-acts evidence from three homeowners who hired defendant to perform work on their homes. He asserts that the evidence was irrelevant because there was no allegation that defendant defrauded these individuals. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "An abuse of discretion occurs when the trial court reaches a result that is outside the range of principled outcomes." *Id*. "Preliminary

---

[1] Kent Circuit Court Local Administrative Order 2018-01(C)(7) provides: "If a defendant's case is dismissed and subsequently re-filed, the case will be assigned to the judge that had been assigned originally. The Prosecutor's Office will be responsible for bringing this to the attention of the court."

questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

The trial court admitted the evidence in question under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The framework for admitting evidence under MRE 404(b) is as follows:

> First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000) (quotation marks and some citation omitted) (alteration in original).]

Here, the prosecutor introduced other-acts evidence from three homeowners who hired defendant to work on their homes; the prosecutor offered the evidence for "the purpose of showing absence of mistake, proof of intent; and proof of scheme, plan, or system in doing an act."[2] Considering the prosecutor's proffered reasons, the trial court did not err by concluding that the other-acts evidence was relevant and offered for a proper purpose. Under MRE 401, relevance consists of two components: materiality and probative value. *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). "The relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *People v VanderVliet*, 444 Mich 52, 75; 508 NW2d 114 (1993), amended by 445 Mich 1205 (1994).

---

[2] Defendant also notes that, although one of the homeowners was listed on the prosecutor's witness list, the prosecutor failed to include him in the notice of intent required by MRE 404(b)(2). Yet, he does not advance an argument that the testimony should have been excluded because the prosecutor failed to comply with MRE 404(b)(2). In any event, the trial court addressed this issue before trial, concluding that the notice was sufficient because the individual was listed on the prosecutor's witness list and the defense was provided a police report relating to his testimony. In other words, defendant is not entitled to relief on appeal because he received reasonable notice before trial; he was not unfairly surprised and he was able to marshal arguments regarding relevancy and unfair prejudice. See *People v Jackson*, 498 Mich 246, 261; 869 NW2d 253 (2015).

Whether defendant intended to permanently deprive the victims of their property was at issue. The defense asserted that defendant was not trying to defraud anyone. Instead, defendant testified that he mistakenly underbid the projects, and he had every intention of finishing the work. In this context, the other-acts evidence related to defendant's conduct involving three other homeowners for whom he performed work and is relevant to establish a common scheme, plan, or system of conducting business. As such, this pattern of business dealings was relevant to an assessment of defendant's intent as well as his assertion that he mistakenly underbid the projects at issue in this case. More specifically, the evidence offered by the other-acts homeowners showed that defendant's conduct involved a pattern or scheme of underbidding projects. For example, defendant asked one of the other-acts homeowners for additional money beyond the contract price even though they never agreed to any change orders. In addition, two of the other-acts homeowners, received refunds from the money for the Hall Street project. On appeal, defendant emphasizes these refunds, and he asserts that none of the other-acts homeowners were defrauded. However, this argument ignores the nature of defendant's scheme, which included paying off past debts with new customers' money as well as failing to meet deadlines, and ultimately abandoning projects without completing the work. Given defendant's assertions that he did not intend to defraud the homeowners in this case, that he mistakenly underbid the projects, and that he intended to finish the work, his pattern of underbidding projects and failing to complete work was relevant and offered for a proper nonpropensity purpose.

Moreover, under MRE 403, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. The other-acts evidence in this case did not involve injecting extraneous considerations into the case nor did this evidence create a risk that evidence with little probative value would be given too much weight. See *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). Instead, the other-acts evidence had significant probative value on the issue of defendant's intent and the absence of mistake. This evidence was not *unfairly* prejudicial, particularly considering the inherent difficulty in proving defendant's state of mind. Moreover, the trial court instructed the jury on the proper use of other-acts evidence, thereby mitigating the risk of prejudice. See *People v Orr*, 275 Mich App 587, 593; 739 NW2d 385 (2007). The trial court did not abuse its discretion by admitting the other-acts evidence under MRE 404(b).

## V. PROSECUTORIAL MISCONDUCT[3]

Next, defendant argues that the prosecutor denied defendant a fair trial by using the phrase "Ponzi scheme" at trial. Citing to definitions of the term "Ponzi scheme," defendant maintains that the term is factually inapplicable to the circumstances in this case. He also asserts that the phrase is highly inflammatory. We disagree.

---

[3] Although defendant characterizes the prosecutor's statements as misconduct, this Court recently explained that a fairer label of most claims of prosecutorial misconduct would be "prosecutorial error," because only the most extreme and rare cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). However, we will use the phrase "prosecutorial misconduct" because it has become a term of art in criminal appeals. *Id*.

"Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial." *Unger*, 278 Mich App at 236. "A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007) (citations omitted). Moreover, a prosecutor need not confine his or her arguments "to the blandest possible terms." *Id.* A prosecutor's remarks must be considered in context, in light of defense counsel's comments, and "[a]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *People v Watson*, 245 Mich App 572, 593; 629 NW2d 411 (2001) (quotation marks and citation omitted).

The prosecutor used the phrase Ponzi scheme during rebuttal as follows:

> Now, what the defendant did is nothing new, it's been happening [since] the 1920s. Charles Ponzi. What the defendant did was a Ponzi scheme. It's a form of fraud in which a purported businessman lures investors and pays profits to earlier investors using the funds from the new people.
>
> So what did the defendant do? He took the [homeowners'] money, and he paid off old projects, people who he did the same thing to. And below these people, below these people are question marks because we don't know the victims before them. But we can't forget about all the collateral damage, all of the other people, they got screwed over because of the defendant's Ponzi scheme.
>
> You see the defendant isn't signing up homeowners to build their dream houses, he is signing them up to be his personal line of credit. And defense counsel says well, how can the prosecutor answer to these photos? How can she explain away what he has done? Ladies and Gentlemen, you want to know what those photos exhibit? It exhibits his scam and con artist skills, because what those photos depict are him stringing along the victims. Yup, I'm doing the work on your project little by little, I'm tearing up your house. Stuff was getting done. That is all those projects show.
>
> But the defendant was running a scam. He was robbing Peter to pay Paul. But when Peter gets angry, this defendant finds new unsuspecting homeowners and victims to quiet Peter and the others. It's a Ponzi scheme. It's a contractor Ponzi scheme.

Contrary to defendants' argument, the prosecutor's use of the phrase Ponzi scheme did not deprive defendant of a fair trial. First, although defendant's conduct was not a traditional Ponzi scheme involving investments and payment of investment returns, there are similarities between defendant's scheme and a traditional Ponzi scheme. Therefore, the prosecutor's characterization of defendant's scheme as "a contractor Ponzi scheme" was a reasonable inference and a permissible argument based on the facts. In particular, as explained by this Court:

> A 'Ponzi' or 'Ponzi scheme' is defined as a swindle in which a quick return on an initial investment paid out of funds from new investors lures the victim into bigger risks. It is named after Charles Ponzi, who was the organizer of such a scheme during 1919 and 1920. [*Sturrus v Dep't of Treasury*, 292 Mich App 639, 642 n 1; 809 NW2d 208 (2011) (quotation marks and citation omitted).]

Additionally, one of the usual characteristics of a Ponzi scheme is that it is conducted "without any operation or revenue-producing activity other than the continual raising of new funds." *Black's Law Dictionary* (11th ed). In this case, the prosecutor's theory was that defendant's only revenue-producing activity involved taking money from new customers without performing work to earn that money and then using this money for purposes unrelated to the projects, such as paying off old customers and subcontractors for other projects. In other words, like a Ponzi swindler using funds from one investor to pay another, defendant also stole from "Peter to pay Paul." Considering the prosecutor's argument as a whole and in context, the prosecutor's argument was a fair characterization of the evidence.

Moreover, the propriety of the prosecutor's rebuttal should be considered in light of defense counsel's arguments. During closing, defense counsel repeatedly asserted that defendant did not have an "evil master plan," that defendant was not engaged in "some Bernie Madoff financial scam," that defendant was simply a "terrible businessman," that defendant was not "lining his pockets and getting rich," and that defendant was not engaged in a "long con." Indeed, in arguing that the prosecutor failed to establish that defendant intended to defraud the victims, defense counsel repeatedly asked "why" defendant would do this—"to get what?" or to "[m]ake off with what?" In responding to these assertions, the prosecutor reasonably argued that defendant did have a scheme and that scheme involved a "contractor Ponzi scheme" in which defendant kept his business going by luring in new customers and stealing from "Peter to pay Paul." On the whole, although the prosecutor did not use the blandest possible terms, the prosecutor's argument was reasonably based on the evidence and it was a fair response to defense counsel's assertion that defendant was not engaged in any type of financial scam. Moreover, even if the phrase "Ponzi scheme" was inflammatory or improper, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements," *Unger*, 278 Mich App at 235. Here, the trial court instructed the jury that the lawyers' arguments were not evidence and to not let sympathy or prejudice influence their decision, thereby curing any potential prejudice. Defendant was not denied a fair trial.

## VI. OFFENSE VARIABLES

Defendant next asserts that the trial court clearly erred by scoring offense variables (OVs) 9 and 19.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of

the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

## A. OV 9

OV 9 relates to the number of victims. MCL 777.39(1). OV 9 is "offense-specific," meaning "only conduct relating to the offense may be taken into consideration when scoring" OV 9. *People v McGraw*, 484 Mich 120, 124, 126; 771 NW2d 655 (2009) (quotation marks and citation omitted). Relevant to this case, OV 9 must be assigned 10 points if there were "4 to 19 victims who were placed in danger of property loss." MCL 777.39(1)(a). Under MCL 777.39(2)(a), "each person who was placed in danger of physical injury or loss of life or property" counts "as a victim."

There were two homeowners for each project; that is, two homeowners who could be counted as victims for each count of larceny by conversion. To reach at least four victims for the sentencing offense, by analogizing to a "home invasion case where children are in the home," the prosecutor argued, and the trial court agreed, that the homeowners' children should also be counted as victims. Including the children, there were 4 to 10 victims, and therefore the trial court scored OV 9 at 10 points.

The trial court clearly erred by scoring OV 9 on the basis of the homeowners' children. To warrant 10 points under OV 9, there must be "4 to 19 victims who were placed in danger of *property loss*."[4] MCL 777.39(1)(c) (emphasis added). And, as noted, victims are those who are "placed in danger of physical injury or *loss* of life or *property*." MCL 777.39(2)(a) (emphasis added). The operative word in these statutory provisions is "property," commonly understood to mean: "something owned or possessed." *Merriam-Webster's Dictionary* (11th ed). Further, when identifying individuals facing danger of property loss, the question is whether the individual faced the danger of a "direct" loss rather than an "indirect" harm as a result of harm to another's property. See, e.g., *People v Carrigan*, 297 Mich App 513, 516; 824 NW2d 283 (2012) (finding fewer than four victims in vandalisms to two schools "each owned by the same school district" and rejecting assertion that persons in the "community," who were indirectly harmed, could be counted as victims).

Applying these principles in this case, certainly there is evidence that the children may be affected by their parents' financial losses. However, the fact remains that the financial and property loss by defendant belonged to the parents, not the children. In other words, the children are not "direct" victims of the crime, rather they are "indirect" victims who will be impacted by their parents' property losses. Because the children were not in danger of "property loss," the trial

---

[4] On appeal, the prosecutor notes that one of the children had some breathing difficulties resulting from living in the home during construction. However, even assuming that defendant's crime of larceny by conversion placed this child in "danger of physical injury or death," there would need to be at least two victims in danger of physical injury or death to merit 10 points under OV 9 on the basis of physical injury or death. MCL 777.39(1)(c). Only one such victim must be scored at zero points. MCL 777.39(1)(d).

court erred by counting the children as victims under OV 9, and OV 9 should have been scored at zero points. See MCL 777.39(1)(d).

## B. OV 19

The trial court did not err by scoring OV 19 at 10 points. This variable involves a "threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services." MCL 777.49. A score of 10 points for OV 19 is warranted when "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice." MCL 777.49(c). "Interfering or attempting to interfere with the administration of justice includes acts that constitute obstruction of justice, but is not limited to such acts." *People v Ericksen*, 288 Mich App 192, 204; 793 NW2d 120 (2010). Moreover, "conduct that 'interfered with or attempted to interfere with the administration of justice' does not have to necessarily rise to the level of a chargeable offense." *People v Barbee*, 470 Mich 283, 287; 681 NW2d 348 (2004). "The investigation of crime is critical to the administration of justice," and consequently, OV 19 may be scored for conduct that interferes with the investigation of a crime. *Id.* at 288. Indeed, "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *People v Sours*, 315 Mich App 346, 349; 890 NW2d 401 (2016).

In assessing 10 points for OV 19, the trial court stated: "Well, I'm going to keep the OV-19 scored as 10 points. When he leaves the area as soon as he knows that there may be charges brought against him, moves to another state, I think that's sufficient to score OV-19."

The evidence at trial supported the conclusion that within days of the homeowners' police reports and a news report about his conduct, defendant withdrew his children from school and went to Illinois. Defendant maintains that going to Illinois did not interfere with the police investigation, and he emphasizes that he eventually returned to Michigan to stand trial. However, these assertions did not preclude the trial court from concluding from the timing of defendant's flight that he initially left the state in an effort to impede the police investigation and avoid the impending charges. *People v Smelley*, 485 Mich 1023 (2010) ("The fact that he voluntarily returned to Michigan does not necessarily mean that defendant did not initially flee to Georgia out of fear of apprehension."). Further, although defendant was unsuccessful in avoiding the charges, OV 19 is properly scored for an "attempt[] to interfere with the administration of justice." MCL 777.49(c); *Sours*, 315 Mich App at 349 ("OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense."). Accordingly, the trial court did not err by assigning 10 points for OV 19.

Although we conclude that the trial court erred by scoring OV 9, defendant is not entitled to resentencing on this basis alone because a 10-point change—reducing defendant's total OV score from 45 to 35—will not alter the applicable guidelines range. *People v Francisco*, 474 Mich 82, 89, n 8; 711 NW2d 44 (2006); MCL 777.65.

## VII. RESTITUTION

Next, defendant argues, and the prosecutor concedes, that the trial court abused its discretion by ordering $287,998.62 in restitution without holding an evidentiary hearing. We agree.

This Court reviews a trial court's award of restitution for an abuse of discretion, and the trial court's findings of fact are reviewed for clear error. *People v Fawaz*, 299 Mich App 55, 64; 829 NW2d 259 (2012). Generally, "a trial court's decision whether to hold an evidentiary hearing is reviewed for an abuse of discretion." *Unger*, 278 Mich App at 216-217. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id.* at 217. A trial court may also abuse its discretion by operating within the wrong legal framework. *People v Kelly*, 317 Mich App 637, 643; 895 NW2d 230 (2016). For example, "[a] trial court may abuse its discretion by blurring the distinction between a civil remedy for damages and the criminal penalty of restitution." *People v Corbin*, 312 Mich App 352, 361; 880 NW2d 2 (2015). To the extent analysis of the trial court's restitution decision involves interpretation of the Crime Victim's Rights Act (CVRA), MCL 780.751 *et seq.*, or other statutory provisions, this Court's review is de novo. *Fawaz*, 299 Mich App at 64.

"Under the CVRA, restitution is mandatory, not discretionary." *Id.* at 65.

> (2) Except as provided in subsection (8), when sentencing a defendant convicted of a crime, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. . . .

> * * *

> (8) The court shall order restitution to the crime victim services commission or to any individuals, partnerships, corporations, associations, governmental entities, or other legal entities that have compensated the victim or the victim's estate for a loss incurred by the victim to the extent of the compensation paid for that loss. The court shall also order restitution for the costs of services provided to persons or entities that have provided services to the victim as a result of the crime. Services that are subject to restitution under this subsection include, but are not limited to, shelter, food, clothing, and transportation. However, an order of restitution shall require that all restitution to a victim or victim's estate under the order be made before any restitution to any other person or entity under that order is made. The court shall not order restitution to be paid to a victim or victim's estate if the victim or victim's estate has received or is to receive compensation for that loss, and the court shall state on the record with specificity the reasons for its action. [MCL 780.766.]

MCL 780.766(3) more specifically provides for restitution for "damage to or loss or destruction of property" and the methods for calculating restitution related to property.

"[T]he prosecution bears the burden of establishing the proper amount of restitution by a preponderance of the evidence." *Fawaz*, 299 Mich App at 65 (quotation marks and citation

-12-

omitted; alteration in original). "The amount of restitution to be paid by a defendant must be based on the actual loss suffered by the victim." *Id.* (quotation marks and citation omitted). "MCL 780.766(2) does not authorize the assessment of restitution based on uncharged conduct." *People v McKinley*, 496 Mich 410, 421; 852 NW2d 770 (2014). Rather, "MCL 780.766(2) requires a direct, causal relationship between the conduct underlying the convicted offense and the amount of restitution to be awarded." *Id.* Restitution is intended to be remedial in nature, *Wright v Genesee Co*, 504 Mich 410, 418 n 3; 934 NW2d 805 (2019), and "[r]estitution awarded by a sentencing court is not a substitute for civil damages," *People v Tyler*, 188 Mich App 83, 89; 468 NW2d 537 (1991). Further, "[r]estitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *Corbin*, 312 Mich App at 370, quoting *United States v Huff*, 609 F3d 1240, 1248 (CA 11, 2010) (quotation marks omitted; alteration in *Corbin*). The amount of restitution awarded must be based on the evidence. *People v Guajardo*, 213 Mich App 198, 200; 539 NW2d 570 (1995).

In this case, the presentence investigation report (PSIR) indicates that the total amount of restitution was calculated at $287,998.62. This amount included restitution for the homeowners and various subcontractors. At sentencing, defendant challenged the amount of restitution on various bases and requested an evidentiary hearing for the prosecutor to prove the amount of restitution by a preponderance of the evidence. The trial court refused to hold an evidentiary hearing, and the trial court did not make any factual findings on the basis of the existing record. Although the PSIR is presumed accurate, this fact alone does not justify the award in this case without an evidentiary hearing. The information contained in the PSIR was sparse, did not substantiate any particular amount, and defendant raised effective challenges to the amounts requested. *People v Waclawski*, 286 Mich App 634, 689-690; 780 NW2d 321 (2009) (outlining procedures for resolving challenges to the PSIR). By failing to address defendant's challenges and by failing to hold an evidentiary hearing, the trial court abused its discretion by awarding a restitution amount that was arbitrary and unsubstantiated. MCL 780.767(4); *People v White*, 212 Mich App 298, 316-317; 536 NW2d 876 (1995).

More specifically, we note that defendant raised several significant challenges in the trial court to the restitution amounts requested. For instance, defendant challenged the request for attorney fees that the Hall Street homeowners incurred in a legal action involving a lien a subcontractor placed on the home. The evidence at trial suggested that the subcontractor paid the homeowners' legal fees, and if the homeowners have actually been compensated for those legal fees, they cannot again collect from defendant.[5] MCL 780.766(8) ("The court shall not order

---

[5] In fact, the restitution request in the PSIR includes over $28,000 for the subcontractor, which, given the evidence at trial, appears to include a request for legal fees relating to the litigation over the lien on the property. Whether the legal fees related to an invalid lien are a direct result of the defendant's criminal acts is also a question that should be decided. *People v Byard*, 265 Mich App 510, 513; 696 NW2d 783 (2005). And, aside from this particular subcontractor, there are subcontractors who received restitution, not all of whom received bad checks from defendant. Given that these subcontractors did not receive bad checks and that defendant was not charged with converting funds from any subcontractor, there is also a question whether the subcontractors

restitution to be paid to a victim or victim's estate if the victim or victim's estate has received or is to receive compensation for that loss . . . ."). The Hall Street homeowners also requested $22,400 for *volunteer* labor; however, it does not appear on this record that the homeowners suffered any actual losses from free labor.[6]

More generally, defendant challenged the amount of losses suffered by the homeowners; and he questioned the basis for their specific figures, noting, for example, conflicts between their requests and their trial testimony.[7] The prosecutor concedes, and we agree, that in the absence of an evidentiary hearing, the record in this case does not substantiate any particular amount of actual losses for either set of homeowners.[8] Further, in the trial court, defendant maintained that he was entitled to credit for work he did perform; and despite considerable evidence—including testimony from the homeowners—that defendant performed at least some work, the trial court failed to consider this issue. Precisely how much work he completed, and how much the homeowners actually lost in light of his work were fact questions, and the evidence on these questions was not uncontroverted. Accordingly, the trial court should have determined whether defendant provided any value to the homeowners in the form of services and products, and that amount, if any, should be offset against the amount of restitution. Given the factual uncertainty for the basis of the homeowners' requests, remand for an evidentiary hearing is warranted. And, if on remand, the prosecution cannot substantiate the specific amounts requested by a preponderance of the evidence, it should be disallowed. Accordingly, we vacate the restitution award and remand for an evidentiary hearing to determine the actual loss caused by the conduct underlying defendant's convictions without affording the victims a windfall.

## VIII. PROPORTIONALITY REVIEW

---

are entitled to restitution in connection with the conduct actually charged in this case. *McKinley*, 496 Mich at 421.

[6] If there is going to be any restitution for the volunteer services provided to the victims, see MCL 780.766(8), there needs to be a determination of the proper amount and it would need to be awarded to the proper parties, i.e., the "volunteers." *Byard*, 265 Mich App at 514.

[7] Notably, the Plymouth Ave homeowners—who paid defendant approximately $64,000—requested the return of $50,000 *and* an additional $59,289.74 to have him pay to complete the house. "[R]estitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *Corbin*, 312 Mich App at 370 (quotation marks and citation omitted). Absent a more specific explanation for this restitution request, it is challenging to see how making them whole would involve defendant refunding their money for work not completed and at the same time paying to complete the project.

[8] The trial court's denial of a motion for an evidentiary hearing on the basis that there had already been a trial suggested that the amount of loss had somehow been decided. There were many numbers mentioned at trial, and extensive testimony about the work or lack thereof that defendant completed, but at no time has there been a determination of the actual amount of losses suffered by the victims in this case.

-14-

Finally, defendant argues that the trial court abused its discretion by departing from the recommended minimum guidelines range and imposing sentences that were unreasonable and disproportionate such that resentencing before a different judge is required. Although we conclude that a remand is warranted for resentencing or further articulation of the reasons for the departure sentence, we decline to remand to a different judge.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017) (quotation marks and citation omitted). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *Id*. (quotation marks and citation omitted; alteration in original). "A sentence is unreasonable—and therefore an abuse of discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant." *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019). "The trial court's fact-finding at sentencing is reviewed for clear error." *Id.* at 125-126.

"[T]he principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Walden*, 319 Mich App 344, 351; 901 NW2d 142 (2017) (quotation marks and citation omitted). The trial court "must take into account the nature of the offense and the background of the offender," and courts may "depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Id*. (quotation marks and citation omitted). When applying the principle of proportionality, factors that may be considered by the trial court include, but are not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Id.* at 352-253 (citation omitted).]

In the context of proportionality review, the legislative guidelines "serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing." *Dixon-Bey*, 321 Mich App at 524-525. For this reason, the trial court must "justify the sentence imposed in order to facilitate appellate review," including "an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *Id*. at 525 (quotation marks and citations omitted).

In this case, the applicable minimum range under the legislative guidelines was 10 to 23 months. The trial court departed from this range and sentenced defendant to 6 to 10 years' imprisonment. In imposing this sentence, the trial court offered the following reasons for deviating from the recommended minimum under the guidelines:

> Okay. I am very familiar with the facts of this case. I sat as judge over the trial of this matter. You were convicted, sir, by a jury of two counts of Larceny by Conversion of $20,000. Each of those carry a maximum penalty of 10 years. You were also convicted of four counts of writing checks without sufficient funds; each of those carry a maximum penalty of two years.

-15-

You're 38 years old, as your counsel points out you have no prior record, no felonies, misdemeanors of juvenile court record. You've never been in jail, on probation or in prison.

This is a situation where you were—you started a business Emry Custom Homes and Remodeling. There were two main victims here, plus a number of subcontractors. And, sir, this whole thing that you did was absolutely outrageous. You lied so many times to these people, to not only the [homeowners], but to your contractors. You told hundreds of lies from what I saw over the course of this trial. You stole money from these people. You would come to them and say you needed this money, 10 or $15,000 to pay a subcontractor to come in when they were in a vulnerable situation with their house torn apart, months after it was supposed to be done, and then you would take that money and go buy a trip to Disney World? Or pay off some other contractors? You would lie to them about what it was, take that money and then go do something else with it.

You are a con man. There is no question about that. And you're here trying to act as a con man. You testified that way during the course of this trial, trying to make the jury feel sorry for you, as if you were the victim in this case, not these people whose homes you ripped apart and stole money from, or these poor subcontractors that go out and do an honest day's work and then don't get their pay. You're exactly what gives the building industry a bad name.

And this is not a civil action. This is a criminal case. Your attorneys never understood that. You acted as a criminal here, lying, deceiving and tricking people out of this money and it seriously affected their families, their kids, their relationships, everything that they've done over the course of their lives. That is absolutely outrageous, unacceptable and you have, other than today, when you're being faced with sentencing, you've shown no remorse for this whatsoever.

Your sentencing guidelines call for a minimum sentence between 10 and 23 months. Those sentencing guidelines, however, do not take into effect the amount of restitution in this matter. It's clearly over $200,000. Sentencing guidelines only take into effect the first $20,000. That's about 12 times more, a quarter of a million in this, than what the guidelines take into effect.

The guidelines don't take into effect that you lied literally hundreds of times to these people and that you have absolutely no remorse whatsoever.

I am aware of People v Tanner that says I cannot impose anything more than two-thirds of the maximum sentence. The maximum sentence on your two counts of conversion is 10 years, that would be 6.6 years.

I am aware of People v Lockridge, that sentencing guidelines are advisory and I have to impose a reasonable sentence. I'm also aware of People v Melbourne [sic], that I have to impose a proportionate sentence, and I believe that I am imposing a reasonable and proportionate sentence, sir, but it is the sentence of this

Court with regards to the two counts of Larceny by Conversion that you be committed to the Michigan Department of Corrections, serve a minimum of six years to a maximum of 10 years on each of those counts. You'll serve in the Michigan Department of Corrections 1 to 2 years on the other four counts. All of these, by law, will be concurrent. You're entitled to 109 days credit on all of this.

The trial court identified two main reasons for defendant's sentence: (1) defendant's numerous lies and acts of deception and (2) the amount of restitution imposed. As a general principle, the trial court did not err by considering these factors as bases for an upward departure.

First, the trial court noted defendant's repeated lies as a reason for the upward departure. As detailed by the trial court, defendant lied to the homeowners to obtain money and he lied to the contractors to obtain work from them without payment. Notably, he told many of the lies when the homeowners were in "a vulnerable situation with their house torn apart, months after it was supposed to be done." The sheer number of lies defendant told—and the many, many people to whom defendant lied—to perpetrate his conversion is not something contemplated by the guidelines. That is, defendant did not simply obtain money and convert it on one occasion; rather, over the course of numerous months, without any sign of remorse, he continued to lie and deceive to obtain more money and to hide his wrongdoing. Further, the trial court's concern for the homeowners' vulnerability to defendant's lies at a time when their homes had been torn apart was not something accounted for by the guidelines. The trial court's remarks about defendant's lies as part of defendant's overall scheme relate to the seriousness of the offense and to matters not adequately accounted for by the guidelines. Accordingly, these issues were properly considered by the trial court when sentencing defendant and justifying the extent of the departure.

Second, with regard to the restitution amount, as the trial court noted, the sentencing offense involved larceny by conversion of $20,000 or more, but to the extent defendant converted substantially more than $20,000, defendant was not similarly situated to a defendant with a comparable criminal history who only converted $20,000. Indeed, as noted by the prosecutor, the trial court assessed 10 points for OV 16 for the loss of property with a value of more than $20,000. See MCL 777.46(1)(d). To the extent defendant converted more than $20,000, that amount, bearing on the seriousness of the offense, is not adequately reflected in the guidelines. Accordingly, the amount lost by the victims as reflected in the restitution award may theoretically be considered by the trial court in sentencing defendant and justifying the extent of the departure.

Although the trial court did not categorically err by considering the amount of restitution when sentencing defendant, the trial court clearly erred by citing the amount of restitution as over $200,000 or a quarter of a million dollars. As detailed earlier, this amount of restitution is not factually supported by the record in this case. Defendant is entitled to be sentenced on accurate information, and there is no indication that the trial court would have imposed the same sentence regardless of the amount of restitution. Indeed, the amount of restitution was one of the trial court's primary reasons for the upward departure; and the amount of restitution awarded to the homeowners was a key justification for the extent of the departure. On this record, if the amount of restitution—or the specific amount defendant converted—is to be used as a basis for an upward departure, it needs to be accurately determined. Because the amount of restitution has not been accurately determined, defendant's upward departure sentence, premised on the conclusion that he owed restitution in the amount of $287,998.62, is not reasonable and proportionate.

-17-

Accordingly, we vacate defendant's sentence and remand for resentencing.

## IX. ALTERNATIVE JUDICIAL ASSIGNMENT

Although we conclude that a remand and resentencing is warranted, we see no reason to grant defendant's request to remand to a different judge. In requesting a different judge, defendant makes no argument—and the record does not suggest—that (1) Chief Judge Trusock will "have substantial difficulty" in putting aside his "previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected" or that (2) reassignment is warranted to preserve the appearance of justice. *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citation omitted). Moreover, given the lengthy trial in this case and the factually detailed restitution issue to be decided on remand, reassignment to another judge "would entail waste and duplication." *Id*. Instead, the matter will be remanded to Chief Judge Trusock for further proceedings.

Affirmed in part, vacated in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly